UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KRISTIE SILLS                          )
(FORMERLY KRISTIE LOHRUM),             )
                                       )
      Plaintiff,                       )
                                       )      CIVIL ACTION NO.
v.                                     )      08-10314-DPW
                                       )
WADDEL & REED, INC.,                   )
SCOTT STAPEL, AND STEVEN ANDERSON      )
                                       )
      Defendants.                      )

MEMORANDUM AND ORDER
February 23, 2009

      Plaintiff Kristie Sills, formerly Kristie Lohrum, brings

this action against her former employer Waddel & Reed, Inc.

("W&R"), a financial services firm, Scott Stapel, W&R's Regional

Vice President for the Northeast Region, and Steven Anderson,

W&R's National Sales Manager, (collectively, the "Defendants"),

alleging gender discrimination and retaliation under 42 U.S.C.

§ 2000e *et seq.* ("Title VII") and Mass. Gen. Laws ch. 151B

("Chapter 151B").  Defendants have moved for summary judgment in

their favor on all of Plaintiff's claims.  For the reasons

discussed below, I will deny Defendants' summary judgement motion

as to Plaintiff's gender discrimination claim, but I will grant

summary judgment as to Plaintiff's claim for retaliation.

## I. BACKGROUND

      I recite the facts in the light most favorable to Plaintiff,

the non-moving party, in this evaluation of the summary judgment

motion.

## A.   *Plaintiff's Employment*

Plaintiff began her employment at W&R in 1983.  W&R is a corporation headquartered in Kansas, which provides financial services and advice to its customers.  In 1988, Plaintiff was promoted to Division Manager of W&R's Waltham office in Massachusetts.  In this capacity, she supervised financial advisors.  Plaintiff did not receive any type of base salary but rather compensation that was mainly based on the earnings of the financial advisors she supervised.

Plaintiff was under the supervision of Stapel starting in October 2003.  Stapel in turn reported Anderson starting in March 2005.  When Stapel and Anderson began evaluating Plaintiff's performance, they purportedly became concerned that Plaintiff was underperforming in some areas they claimed to be important to the long-term growth of the Waltham office, in particular her ability to recruit and retain productive financial advisors.  In addition, Stapel and Anderson were purportedly concerned that Plaintiff's performance was being skewed by one particularly successful advisor in her office, Curt Ridlon, and that "Curt's production . . . was potentially hiding some real issues in the office."  At that time, the performance of W&R's Division Managers was based on various categories, including (a) recruitment of new advisors; (b) performance of first and second

year advisors; (c) investment sales; (d) financial plans; (e) financial planning fees; (f) insurance products; (g) incentive volume credit, which measured the revenues from first, second and third year plus advisors; and (h) ability to retain high producing financial advisors.  Each quarter, Division Managers received a Division Sales Management Report listing the numbers achieved in each of the categories.  In each category, these numbers ranged from one to five, one being unsatisfactory and five being exceptional.  In addition, Division Managers received various types of awards based on their performance, which provided trips and stock incentive programs.  Awards included the Crest Award, the Stock Award, the Honor Award, and the Achievement Award, which was the most prestigious.

Plaintiff argues that, contrary to Defendants' suggestions, her overall performance as a Division Manager was satisfactory in 2005.  In June 2005, Plaintiff received a quarterly score of 2.8 and a yearly score of 3.0 while seven other male Division Managers in the Northeast Region received lower scores during the same time period.  At that time, Stapel noted that Plaintiff was overall "on track" but that Plaintiff had to "[m]ake sure that Curt [did] not carry [her] Division."  In December 2005, Plaintiff received a quarterly score of 3.15, a score higher than that obtained by eight male Division Managers in the region.  As a result of her performance in 2005, Plaintiff received the Honor

Award and the Stock Award.[1]

In October of 2005, a gay female financial advisor of the
Waltham office found some Christian-based anti-gay marriage
literature on her desk.  Plaintiff investigated the incident and
reassured the female advisor that it would never happen again.
Stapel heard about the incident shortly thereafter but did not
speak to Plaintiff about it until April 2006.

During the same time period, Stapel requested that Plaintiff
clock in and out each time she was in the office because he
believed that her purported underperformance could be due to the
fact that Plaintiff did not spend enough time in the office.
Plaintiff denies, however, that Stapel could have had good faith
belief that she was not spending enough time in the office and
asserts that, in any event, the time spent in the office did not
necessarily reflect the time that she actually worked because she
also worked outside of the office by attending fairs and
networking meetings.

On January 31, 2006, Stapel sent a letter to Plaintiff to
"extend [his] sincere congratulations for [her] achievement of
2006 Circle Qualification,"[2] stating that "[her] proven ability

_____

[1]  Division Managers were eligible for the Stock Award when
they ranked in the top sixty nationwide in certain categories.

[2] In the statement of material facts, Plaintiff inaccurately
identifies this letter as dated January 30, 2006.  It appears
that the reference to "Circle Qualification" involves the Honor
Award.

to lead [her] division d[id] not go unnoticed."  Subsequently, Plaintiff sent an update on the assignments Stapel had given her in August 2005 and Stapel replied that she had done a "nice job."

On April 11, 2006, Stapel spoke with Warren Juravoty, a District Manager who worked in the Waltham Office and reported to Plaintiff.  During this conversation, Juravoty told Stapel that there were issues about the Waltham office, in particular about Plaintiff.  A few days later, Juravoty sent a memorandum to Stapel reporting complaints made by financial advisors ("Juravoty's Memorandum").  For instance, advisors purportedly reported that Plaintiff "was never around and never added any value to what was going on in the [Waltham] office" and that she was "not a manager and should not have this position."  Plaintiff contends that she was never informed about Juravoty's Memorandum and was never given the opportunity to respond to the allegations made in this memorandum.

On April 18, 2006, Stapel confronted Plaintiff regarding the anti-gay marriage literature incident.  Plaintiff felt that Stapel was blaming her.  In addition, Stapel requested Plaintiff to "relocate" some of the religious artwork she had in her office, so that it would not be visible to the W&R's personnel and clients.  During this meeting Stapel asked Plaintiff to step down from her Division Manager position to another role at W&R.

B.    *Plaintiff's Response*

On April 24, 2006, Plaintiff contacted Sara Kirsher, Vice President of W&R's Human Resources Department, alleging that Stapel "was treating her differently than other managers; and specifically she felt he was discriminating against her on religious grounds and based, also based on her gender because of a special logging in and logging out that he required her to do." Thereafter, Kirsher contacted Stapel to discuss Plaintiff's complaint.  Stapel explained that he had asked Plaintiff to "relocate" and not "remove" her artwork because he had heard complaints from W&R's personnel that "they were feeling pressure, religious pressure."  Stapel further explained he had asked Plaintiff to clock in and out because he was concerned she did not spend enough time at the office.  On the same day, Stapel contacted Jennifer Lepentis, W&R's in house counsel, to discuss "what was going on in the Waltham office."  Plaintiff alleges that from that time, Stapel began to "belittle" her and "was trying to force [her] out."

On May 4, 2006, Stapel conducted interviews of the financial advisors of the Waltham office.  When questioned about the reason that lead him to conduct these interviews, Stapel explained that "[t]he timing was associated with reports that [he] had received that there was some severe issues in the Waltham office, and [he] feared for the assets of Waddell & Reed, namely the advisors and

the assets they managed."  The comments made by the advisors interviewed by Stapel were generally very positive about Plaintiff.  The comments included observations that "Kristie has kept all of her promises," she "does a good job briefing," and "Kristie is supportive in a cheerleader type of way."  Because Stapel felt that "advisors seemed very - very guarded and not relaxed and natural" during the interviews, he asked Plaintiff whether he had prepped the advisors but Plaintiff denied having done so.  Stapel subsequently reported these interviews to Anderson.  However, Anderson merely recalls that Stapel "had confirmed some of the things that he was, that he thought was suspicious in terms of attendance, in terms of erratic behavior, and in terms of productivity" but he could not recall seeing a copy of the handwritten notes taken by Stapel during the interviews.

During the same time period, Stapel conducted similar interviews with the financial advisors of Marc Dobbs, the Division Manager of W&R's Wyomissing office in Pennsylvania. Stapel received negative comments about the way Dobbs managed the office, including that "[t]hings ha[d] not been good, lost 5 advisors since Oct 05;" an advisor even admitted that "the office (culture) was so bad that he would not invite [his] best recruit to interview at this office (especially women)."  Stapel also received negative comments about Dobbs' conduct, including that Dobbs said "things that were threatening or insulting" and that

he was "degrading to women (talks down, degrades, hassle guys to the strip clubs)."   Nevertheless, Stapel asserted that he knew that Dobbs "from a production standpoint was a very, very good manager when he was 'on his game'" and decided, after considering the possible courses of action, to "move forward from these incidents and see if the advisors felt comfortable with that or whether there was additional steps that needed to be taken."

On or about May 10, 2006, Kirsher contacted Plaintiff to report about her conversation with Stapel.  Kirsher mentioned that asking that a religious artwork be relocated to a "neutral position" was consistent with W&R's company practice, even though no written guideline regarding the display of religious artwork was in place at the time.  Kirsher also told Plaintiff that the fact that Stapel asked her to clock in and out was based on a legitimate management concern about her performance and therefore was not inconsistent with W&R's policy.

Throughout the remainder of 2006, Plaintiff alleges that Stapel continued to be critical of her performance and kept pressuring her to leave her position as Division Manager. Plaintiff further contends that, during this time period, Stapel continued to prepare documentation concerning her conduct, in particular handwritten notes taken on May 14 and 26, 2006, in which Stapel reported that Plaintiff had performance issues and unacceptable conduct.  Stapel later characterized these notes as merely a "think-through process he was going through at the

time."

Notwithstanding these events, Plaintiff received a 3.25 rating on her June 2006 Division Global Review, ranking higher than seven other male Division Managers in the Northeast Region. When questioned about the reason why male Division Managers – in particular Alan Besnoff, Ken White, and Ken Wakefield – with lower scores were not asked to leave their position, Stapel explained that they were very good managers, who were giving it "a good effort" and therefore deserved the benefit of the doubt.

## C.   *Plaintiff's Demotion*[3]

On December 18, 2006, Anderson authorized Stapel to remove Plaintiff from her position as Division Manager.  On that day, Stapel appeared at a train-the-trainer meeting at W&R's office in Woburn, Massachusetts, to inform Plaintiff that he wanted her to accept a District Supervisor position.  Stapel also informed her that if she accepted, she would still receive her bonus for 2006.

---

[3]  Plaintiff argues that what she characterizes as the demotion from the position of Division Manager to the position of District Supervisor was a "two-step demotion."  Because neither party has produced any evidence regarding W&R's structural organization, it remains unclear whether such an action qualifies as a "two-step demotion."  What is clear, however, is that as a District Supervisor, Plaintiff's compensation would be based on her earnings only, as opposed to being based on the earnings of all the financial advisors under her supervision, and that she would not have the same supervisory responsibilities.  Treating the evidence in the light most favorable to the Plaintiff, I will adopt the characterization "demotion" and reserve until Section III.A.1.(ii) *infra*, consideration of whether it was an adverse employment action.

He gave her a letter summarizing the reasons for her demotion. These reasons included "an inability to recruit effectively and the lack of growth in the core of the division, an inability to retain financial advisors, a failure to provide leadership in the division, an inability to manager the division properly, a lack of accountability to the Regional Vice President, unacceptable performance against 2006 business plan, and [her] presentation of unacceptable 2007 business plan."

Plaintiff considered that being demoted from Division Manager to District Supervisor was not a viable option for her. Plaintiff contends that had she accepted the District Supervisor position, she would have had to rebuild a client base, which would have been difficult given the fact she had given up her client base when she became a Division Manager.  As a result, Plaintiff refused the demotion and her employment with W&R ended on December 18, 2006.  At that time, the Waltham's office ranked number 2 out of 16 in the Northeast Region with regard to year-to-date financial planning activity, number 9 out of 16 with respect to year-to-date base earnings, and number 11 out of 16 with regard to year-to-date first year base earnings.  W&R did not place any other Division Manager in the Waltham Office after Plaintiff's departure, but rather downgraded this office to a district office, subject to managerial supervision from another office.

### D.   Procedural History

On or about July 19, 2007, Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission.

On February 25, 2008, Plaintiff brought the present action against the Defendants asserting gender discrimination under Chapter 151B, §§ 4(1) and 5 (Count I) and 42 U.S.C. § 2000e-2(a)(1) (Count II), and retaliation under Chapter 151B, §§ 4 and 4(a) (Count III) and 42 U.S.C. § 2000e-3 (Count IV) for complaining about religious discrimination.  Plaintiff seeks the payment of back and front pay, damages for emotional distress, and punitive damages.

Following the completion of discovery, Defendants filed the motion for summary judgment before me.  Defendants argue that summary judgment should be granted because Plaintiff has allegedly failed to raise any genuine issue of material facts regarding whether she was asked to step down for her Division Manager position because of her gender or whether she was retaliated against after complaining about religious discrimination to the W&R's Human Resources department.

## II.   STANDARD OF REVIEW

A court must grant summary judgment when it concludes based

Case 1:08-cv-10314-DPW   Document 46   Filed 02/23/10   Page 12 of 28

on "the pleadings, the discovery and disclosure materials on file, and any affidavits . . . that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, a fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* While the moving party has the burden of showing that there is no genuine issue of fact, "the plaintiff is not thereby relieved of [her] own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256.

A summary judgment motion in an employment discrimination case presents additional concerns. "[C]ourts must be 'particularly cautious' about granting [an] employer's motion for summary judgment" in a discrimination case where a plaintiff "makes out a prima facie case and the issue becomes whether the employer's stated non-discriminatory reason is a pretext for discrimination." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) (quoting *Stepanischen v. Merch. Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983)). Summary judgment is nevertheless appropriate where an employee's evidence regarding pretext is particularly weak. *See Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003). Similarly, even

"'where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (quoting *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000)).  "Where, however, the nonmoving party has produced more than that, trial courts 'should use restraint in granting summary judgment where discriminatory animus is in issue.'" *Hodgens,* 144 F.3d at 167 (quoting *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997).

### III.   DISCUSSION

**A.   *Gender Discrimination (Counts I and II)***

Plaintiff argues that Defendants intentionally, willfully, and maliciously discriminated her on the basis of her gender and in violation of Title VII and Chapter 151B, when she was asked to step down for the position of Division Manager.

Massachusetts and federal law provide that it shall be an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's gender. Chapter 151B, § 4(1); 42 U.S.C. § 2000e-2(a)(1).

1.   Governing Legal Framework

Employment discrimination claims brought under Chapter 151B or Title VII are governed by the familiar *McDonnell Douglas* three-step burden-shifting framework. *Windross v. Barton Protective Serv., Inc.,* 586 F.3d 98, 103 (1st Cir. 2009); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). While *McDonnell Douglas* involved a purported violation of Title VII, the Supreme Judicial Court of Massachusetts has adopted its three-part test to employment discrimination claims arising under Chapter 151B. *See Abrahamina v. President and Fellows of Harvard Coll.,* 731 N.E.2d 1075, 1084 (Mass. 2000) ("Applying the statute [Chapter 151B] in these circumstances, where there is no direct evidence of discrimination, we follow a three-stage order of proof set forth by the United States Supreme Court under the Federal Anti-Discrimination provisions of Title VII.").

The plaintiff first has the burden of showing, by a preponderance of the evidence, a *prima facie* case of discrimination. *Windross,* 586 F.3d at 103. Once the plaintiff demonstrates a *prima facie* case, "the employer can rebut the presumption by articulating a legitimate, nondiscriminatory reason for its employment decision." *Id.* If the Defendant articulates such a reason, the burden returns to the plaintiff to show that "the defendant's reasons are pretextual or that the defendant's real motivation was discriminatory." *Id.* at 103-04.

2. Application of the *McDonnell Douglas* Framework

-14-

a.   *Prima Facie Case*

In order to establish a *prima facie* case, Plaintiff must show "(1) [she] is a member of a protected class; (2) [her] employer took an adverse employment action against [her]; (3) [she] was qualified for the employment [she] held; and (4)[her] position remained open or was filled by a person whose qualifications were similar to [hers]." *Douglas v. J.C. Penney Co., Inc.*, 474 F.3d 10, 13-14 (1st Cir. 2007) (quoting *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001)).  The burden for establishing a *prima facie* case is "not onerous." *Kosereis*, 331 F.3d at 213 (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000)).

(i)   Protected Class

Plaintiff easily satisfies the first prong required to establish a *prima facie* case.  As a woman, she is a member of a protected class.  *See* Chapter 151B, § 4(1); 42 U.S.C. § 2000e-2(a)(1); *see also Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000) ("A reasonable juror could find" that a female is a member of a protected class "in the sense that every person is in a class protected against gender discrimination.").

(ii)   Adverse Employment Action

While Plaintiff must show that she suffered an "adverse" employment action to establish a *prima facie* case, "[d]ischarge, however, constructive or otherwise, is not the only 'adverse

employment action' that can satisfy this element." *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 157 (1st Cir. 2009).  Rather, an adverse employment action has been defined broadly to include any material "disadvantage . . . in respect to salary, grade, or other objective terms and conditions of employment." *Id.* (quoting *MacCormack v. Boston Edison Co.*, 672 N.E.2d 1, 8 (Mass. 1996)); *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005) ("Typically, an adverse employment action involves a discrete change in the terms and conditions of employment (say, a discharge, demotion, or reduction in pay).").  Moreover, whether an employment action is "adverse" is "gauged by an objective standard." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002).  "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Id.* (quoting *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996)).

Here, Plaintiff argues that Stapel's attempt to demote her from a Division Manager position to a District Supervisor position constitutes an adverse employment action.  In support of this assertion, Plaintiff explains that she would have never accepted such a position because "monetarily it made no sense." In addition, Plaintiff contends that "[she] had built [her] division since 1988 with a lot of [her] money and [her] own time

. . . [and that to] have one or two people working under [her] and trying to build [her] business from scratch again like [she] did in '83 was impossible."  By contrast, Defendants argue that Plaintiff's demotion does not constitute an adverse employment action because District Managers have comparable benefits and could earn as much as Division Managers, and that in any event, Plaintiff would not be able to show that she was constructively discharged.[4]

Contrary to Defendants' allegations, I find that as a District Supervisor, Plaintiff would not have the supervisory responsibilities she had as a Division Manager.  I also find that Plaintiff's compensation would be reduced because her compensation would have only be based on her earnings as opposed to being based on the earnings of all the financial advisors under her supervision, *see* Note 3 *supra*.  Under these circumstances, a jury could reasonably conclude in the light most favorable to Plaintiff that the demotion offered by Defendants constitutes an adverse employment action sufficient to satisfy

---

[4]  A "[c]onstructive discharge occurs when the employer's conduct effectively forces an employee to resign . . . [and when] the employment relationship is actually severed involuntarily by the employer's acts against the employee's will."  *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 160 n.18 (1st Cir. 2009) (quoting *GTE Prods. Corp. v. Stewart*, 653 N.E.2d 161, 168 (Mass. 1995)).  Because I find that the demotion proposed by Defendants constitutes an adverse employment action, I need not decide whether Plaintiff has demonstrated she was constructively discharged.

the second prong of the test.  Accordingly, I find this prong to be satisfied.

(iii)  Qualified for Employment Held

Plaintiff argues that she performed her job at a satisfactory level during her employment at W&R.  Specifically, Plaintiff points out that she was praised by Stapel on numerous occasions and won awards based on her performance.

Here, I find the performance review evidence shows Plaintiff was qualified for the employment she held.  Although the performance of Plaintiff may not be without criticism, for the most part I find the level of job performance described was, at a minimum, satisfactory.  Taking the facts in the light most favorable to the Plaintiff, I conclude that Plaintiff has succeeded in satisfying the third prong of the test.

(iv)  Replacement

A plaintiff "need not demonstrate that a new employee was hired or a current employee was formally designated as a replacement in order to satisfy the fourth prong of the prima facie case." *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.,* 399 F.3d 52, 59 (1st Cir. 2005).  "A replacement need not be sought from outside the company . . . nor need he be designated formally as such."  *Id.* (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 n.11 (1st Cir. 1979)).  Rather, the fact that "plaintiff's job functions were absorbed by several different employees of

defendant" is sufficient to establish the fourth *prima facie* element. *Id.* (quoting *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 760 (1st Cir. 1988)).

Here, Plaintiff asserts – and Defendants confirm – that after her employment with W&R ended, Defendants downgraded the Waltham office to a district office and the employees and financial advisors of the Waltham office were assigned to other Division Managers.

Accordingly, I find that the fact that Plaintiff's functions were transferred to other Division Managers is sufficient to establish that Plaintiff satisfied the fourth prong of the test, thereby satisfying the relatively light burden Plaintiff bears in establishing a *prima facie* case.

        b.   *Defendants' Proffered Legitimate Non-Discriminatory Reason for Demotion*

Because Plaintiff has demonstrated a *prima facie* case, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for Plaintiff's demotion. *Windross,* 586 F.3d at 103. "[A]n employer must not only give a lawful reason or reasons for its employment decision but also must produce credible evidence to show that the reason or reasons advanced were the real reasons." *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 646 N.E.2d 111, 115 (Mass. 1995) (quoting *Wheelock College v. Mass. Comm'n Against Discrimination*, 355 N.E.2d 309,

314 (Mass. 1976)).  Defendants' burden to show a non-discriminatory reason for their action is "not onerous."  *Id.*

Defendants contend that Plaintiff was demoted because her overall performance as Division Manager was not at a satisfactory level.  Specifically, Defendants assert that they became concerned that Plaintiff was underperforming in some key areas, specifically recruiting and retaining productive financial advisors.  In addition, Defendants feared that Plaintiff's performance were being skewed by the performance of Curt Ridlon, one of the most productive financial advisors.  As Defendants point out, Plaintiff admitted that, between 2003 and 2006, her "numbers were not where [she] wanted them to be . . . [a]t the level that the company thought were needed to be met to hit the trips and stock."

Accordingly, I find that Defendants have met their fairly light burden to establish a legitimate, non discriminatory reason for Plaintiff's demotion.

> c.  *Pretext*

Because Defendants demonstrated a legitimate non-discriminatory reason for Plaintiff's demotion, Plaintiff must show that the reason provided by Defendants was mere pretext and that the real reason for demotion was discrimination.  *Windross,* 586 F.3d at 103.  The federal and state statutes slightly differ in this respect.  Massachusetts law appears to be less stringent

than federal law, because it would allow a plaintiff to overcome a motion for summary judgment "if the plaintiff shows that just one of the proffered reasons was pretextual." *Douglas*, 474 F.3d at 14 n.2 (citing *Joyal v. Hasbro*, Inc., 380 F.3d 14, 17 (1st Cir. 2004)). By contrast, Title VII requires that a plaintiff must show, in addition to pretext, that "the true reason was prohibited discrimination." *Id.* (citing *Straughn*, 250 F.3d at 34). As a result, the Massachusetts standard is sometimes labeled as "pretext only" and the First Circuit rule as a "pretext-plus" standard. *See, e.g., Mullin v. Raytheon Co.*, 164 F.3d 696, 699 (1st Cir. 1999) (describing the "difference between the federal 'pretext-plus' standard and the Massachusetts 'pretext-only' standard"); *Dichner v. Liberty Travel*, 141 F.3d 24, 30-31 (1st Cir. 1998) (same).

Although the First Circuit has recognized that "there can be no mechanical formula at the third stage" of the *McDonnell Douglas* framework, the question is ultimately whether "the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 57 (1st Cir. 1999) (quoting *Rodriguez-Cuervos v. Wal-Mart Stores*, Inc., 181 F.3d 15, 22 n.5 (1st Cir. 1999)). A plaintiff can show that "an employer's stated reasons are pretextual 'in any number of ways,' including by producing

evidence that plaintiff was treated differently from similarly situated employees." *García v. Bristol-Myers Squibb Co.,* 535 F.3d 23, 31 (1st Cir. 2008) (quoting *Kosereis*, 331 F.3d at 214). "To successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to [her] in all relevant respects were treated differently by the employer.'" *Id.* The comparators "need not be perfect replicas," but they must "closely resemble one another in respect to relevant facts and circumstances." *Id.* (quoting *Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 20 (1st Cir. 1999)). Under this rule, Plaintiff must demonstrate that "she was similarly situated to . . . [other Division Managers] in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations." *Smith v. Stratus Computer,* 40 F.3d 11, 17 (1st. Cir. 1994) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Conward,* 171 F.3d at 20 (quoting *Dartmouth Review v. Dartmouth Coll.*, 889F.2d 13, 19 (1st Cir. 1989)).

Plaintiff relies on comparator evidence to show that she was treated less favorably than male Division Managers working in the

Northeast Region whose performance was inferior to her own.[5]
Plaintiff argues that these Division Managers are appropriate
comparators because they were evaluated by the same standards,
had the same duties, and reported to the same supervisor, Stapel.
Specifically, Plaintiff points to eight Division Managers,
including Alan Besnoff, Christopher Ohlert, Ken Wakefield and
Mark Dobbs, who were not demoted despite comparatively poor
performance.  In addition, Plaintiff questions the fact that
Stapel did not demote Dobbs when there was evidence, not only of
his poor performance, but also of gender-demeaning conduct on his
part.

By contrast, Defendants argue that the comparators used by
Plaintiff do not provide a valid comparison.  In particular,
Defendants claims that Ohlert and Besnoff did not have the same
level of seniority as Plaintiff, because they became Division
Managers in 2005 and 2000 respectively, and that Besnoff faced
the additional challenge of starting a fairly small office in New
Hampshire.  Furthermore, Defendants argue that other male
Division Managers, who had been mentioned by Plaintiff as

---

[5] Following the hearing held on this motion, Plaintiff filed
a motion for leave to enlarge the summary judgment record.
Specifically, Plaintiff sought admission of a complaint filed
against Stapel by his former female administrative assistant in
August 2009 alleging discriminatory statements made by Stapel.
While it is unclear whether such evidence would be admissible in
that form, I do not rely on it for purposes of this memorandum
and consequently will deny the motion to enlarge the record as
moot.

receiving lower rankings than her, were no longer Division Managers because either they left W&R or they had been demoted to a District Supervisor position.  Defendants fail, however, to produce evidence supporting this assertion.

Under these circumstances, I find that while the male comparators are "not perfect replicas" of Plaintiff, they nonetheless resemble one another in terms of performance, qualifications and conduct sufficiently to be considered adequate comparators.  Reading the record in the light most favorable to Plaintiff, I find that there is sufficient evidence to enable a rational factfinder reasonably to infer that Plaintiff was treated differently than other "similarly situated" Division Managers, Dobbs in particular, and therefore that unlawful gender discrimination was a determinative factor in the adverse employment action.

Accordingly, because I find that a genuine issue of material fact exists regarding the cause of Plaintiff's demotion, I conclude that Defendants' motion for summary judgment should be denied as to Plaintiff's claims of gender discrimination (Counts I and II).

## B.   *Retaliation (Counts III and IV)*

Plaintiff also argues that Defendants wrongfully retaliated against her, in violation of Title VII and Chapter 151B, by demoting or otherwise harassing her in response to the complaint

she made to Sara Kircher, Vice President of W&R's Human Resources
Department, about Stapel's alleged discriminatory actions.[6]

1.   Governing Legal Framework

Title VII makes it unlawful for an employer to "discriminate
against any of his employees . . . because he has opposed any
practice made an unlawful employment practice by this
subchapter."  42 U.S.C. § 2000e-3.  Similarly, Chapter 151B makes
it unlawful for an employer "to discharge, expel or otherwise
discriminate against any person because he has opposed any
practices forbidden under this chapter or because he has filed a
complaint, testified or assisted in any proceeding under section
five."  Mass. Gen. Laws ch. 151B, § 4(4).

Under both Title VII and Chapter 151B, claims for
retaliation may also be evaluated according to the three stage
*McDonnell Douglas* burden-shifting framework.  *See Mariani-Colón
v. Dep't of Homeland Sec.*, 511 F.3d 216, 223 (1st Cir. 2007)
(Title VII); *Mole v. Univ. of Mass.*, 814 N.E.2d 329, 338 (Mass.
2004) (Chapter 151B); *see also McDonnell*, 411 U.S. 792, 802

---

[6]  In the complaint in this action, Plaintiff alleges that
Defendants retaliated against her for complaining about religious
discrimination.  During the hearing held on this motion, as well
as in subsequent briefing, Plaintiff confirmed that her claim for
retaliation was based on religious discrimination (*i.e.*, Stapel's
request to remove her religious artwork from her office) rather
than on gender discrimination.  In any event,"[a]s a matter of
law, [Plaintiff's] retaliation claim may be viable even if the
underlying discrimination claim is not."  *Benoit v. Technical
Mfg. Corp.*, 331 F.3d 166, 174 (1st Cir. 2003).

(1973).  To establish a *prima facie* case of retaliation under both federal and state law, "a plaintiff must show that (1) she undertook protected conduct, (2) she suffered an adverse employment action, and (3) the two were causally linked." *Noviello*, 398 F.3d at 88.

2.   Application of the *McDonnell Douglas* Framework

Plaintiff clearly meets the first prong of the test because she engaged in protected conduct when she complained to Sara Kircher, Vice President of Human Resources at W&R, that Stapel's conduct towards her constituted religious discrimination. Specifically, Plaintiff had complained that Stapel treated her differently by asking her to take down her religious artwork and requiring her to clock in and out.

The second and third prongs are, however, more problematic in this case.  With respect to the second prong, namely the adverse employment action, Plaintiff's claim is unclear. Plaintiff does not specifically claim a hostile work environment,[7]

---

[7] In general, a plaintiff may recover on the theory of hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). For the reasons discussed below, I find, however, that there is no causality between the protected activity and the adverse employment action.  Thus, I need not discuss whether in this case Plaintiff could have recovered under the theory of hostile work environment.

nor does she refer to her demotion as being the adverse
employment action allowing her to satisfy the second prong of
demonstrating a *prima facie* case.  To the extent, however, that
Plaintiff claims that the adverse employment action she suffered
is her demotion, I have concluded that such a demotion
constitutes an adverse employment action.  *See* Section
III.A.2.a.(ii) *supra*.  Accordingly, I find the second prong of
demonstrating a *prima facie* case to be satisfied.

However, with respect to the last prong of the inquiry, the
link between the protected activity and the adverse employment
action, I note that where "adverse employment actions or other
problems with an employee predate any knowledge that the employee
has engaged in protected activity, it is not permissible to draw
the inference that subsequent adverse actions, taken after the
employer acquires such knowledge, are motivated by retaliation."
*Mole*, 814 N.E.2d at 340 (citing *Clark County Sch. Dist. v.
Breeden*, 532 U.S. 268, 272 (2001) (per curiam) (employer
"proceeding along lines previously contemplated, though not yet
definitively determined, is no evidence whatever of causality")).
Here, Plaintiff expressly stated that it was on April 18, 2006 –
six days before she contacted Kircher – when Stapel had asked her
to step down from her Division Manager position to another role
at W&R.  This establishes that the adverse employment action
regarding Plaintiff was contemplated before her complaint to

Kirsher, though that action did not take place until eight months later.[8]  Thus, Plaintiff falls well short of demonstrating that a causal link existed between the protected activity and the adverse employment action.

Accordingly, I conclude that Defendants are entitled to judgment as a matter of law as to Plaintiff's claim for retaliation (Counts III and IV).

### IV.   CONCLUSION

For the foregoing reasons, I DENY Defendants' motion for summary judgment as to Plaintiff's Counts I and II and GRANT Defendants' motion for summary judgment as to Plaintiff's Counts III, and IV.  (Dkt. No. 29.)


/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[8]  The date at which Stapel considered that, in his opinion, the Plaintiff's performance was not going to improve and therefore required demotion remains, however, in dispute.  While Plaintiff argues that it was as early as April of 2006, Defendants contends that it was only in November of 2006.